IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


RACHEL SAWYER and DUSTIN ARNOLD,

    Plaintiffs,

    v.

LEGACY EMANUEL HOSPITAL & HEALTH CENTER; JAMES COUGHLIN, M.D.; SUNSHINE CRONE; and CAROLINA CABALLERO,

    Defendants.

Case No. 3:18-cv-02128-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

    Plaintiffs Rachel Sawyer ("Sawyer") and Dustin Arnold ("Arnold") (together, "Plaintiffs") filed claims under 42 U.S.C. § 1983, alleging that Defendants Legacy Emanuel Hospital & Health Center ("Legacy Emanuel"), James Coughlin, M.D. ("Dr. Coughlin"), Sunshine Crone ("Crone"), and Carolina Caballero ("Caballero") (collectively, "Defendants") violated their civil rights by removing their baby ("I.S.") from their custody and denying their right to make medical decisions on behalf of I.S.[1] The Court granted the Legacy Defendants'

---

[1] The Court will refer to Legacy Emanuel, Coughlin, and Crone collectively as the "Legacy Defendants," because Legacy Emanuel employs Coughlin and Crone. (First Am.

PAGE 1 – OPINION AND ORDER

motion to dismiss Plaintiffs' original complaint with leave to amend, and the Legacy Defendants now move to dismiss Plaintiffs' amended complaint for failure to state a claim. The Court has jurisdiction over this matter under 28 U.S.C. § 1331, and the parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c)(1). For the reasons explained below, the Court grants the Legacy Defendants' motion to dismiss (ECF No. 24).

## BACKGROUND[2]

In September 2016, Sawyer went into labor on a flight from Florida to Portland, Oregon. (FAC ¶ 8.) An ambulance transported Sawyer to Legacy Emanuel when she arrived in Portland. (FAC ¶ 10.) Legacy Emanuel's medical staff examined Sawyer upon her arrival at the hospital. (FAC ¶ 11.)

During Sawyer's initial examination, a nurse asked Sawyer "to do a heartbeat radar for the baby and an ultrasound." (FAC ¶ 11.) Sawyer told the nurse that she wanted to "use a stethoscope to check the baby's heart rate" because she did not want to use "any technology during her pregnancy." (FAC ¶ 11.) After the nurse told Sawyer that Legacy Emanuel did not have stethoscopes and an ultrasound would reveal whether the baby was in the breech position, Sawyer told the nurse that (1) "if the baby was breech, she would stay in a squatting position for a lotus birth and allow the baby to come out on its own," (2) she "did not want any vaccines administered to the baby," (3) she was declining eye ointment and a vitamin K shot, and (4) she

---

Compl. ("FAC") ¶¶ 4-5.) The Department of Human Services ("DHS") employs Caballero. (FAC ¶ 7.)

[2] The Court takes these facts from Plaintiffs' amended complaint and assumes they are true for the purpose of deciding this motion. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (stating that when reviewing a motion to dismiss for failure to state a claim, a court must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party").

wanted to wait for Arnold to arrive before "deciding whether or not to allow an ultrasound." (FAC ¶¶ 11-12.)

After Arnold arrived at the hospital, Plaintiffs allowed the attending physician to perform an ultrasound. (FAC ¶ 16.) The ultrasound confirmed that Plaintiffs' baby was in the breech position, and prompted the physician to exclaim that Sawyer needed a Cesarean section ("C-section"). (FAC ¶ 17.) Sawyer told the physician that she did not want a C-section. (FAC ¶ 18.) Legacy Emanuel's medical staff advised Sawyer that nobody present "had any experience delivering a breech baby vaginally," and the medical staff never advised Sawyer that "the only service offered by the hospital in the event of a breech would be a surgical C-section." (FAC ¶ 18.)

Immediately afterward and before the medical staff could administer an epidural injection, Sawyer's "baby came out with only its head and left arm still in the birth canal." (FAC ¶ 19.) The staff responded by forcing Sawyer "to her back . . . against her will." (FAC ¶ 19.) The attending physician then "reached up and pulled on the baby" and fractured the baby's arm. (FAC ¶ 20.) The physician clamped and cut the baby's umbilical cord, even though Plaintiffs "requested delayed cord clamping." (FAC ¶ 21.) The medical staff also took the baby to another room before Plaintiffs learned the baby's gender. (FAC ¶ 21.)

The medical staff eventually moved Sawyer and her baby to a recovery room where they asked Sawyer to "sign forms regarding declining the eye ointment and vitamin K shot." (FAC ¶ 22.) Several hours later, Crone, a social worker, interviewed Plaintiffs and the physician and medical staff who helped deliver I.S. (FAC ¶¶ 23-24.) Crone determined that Plaintiffs needed a car seat, but it was safe to discharge the baby into their care and custody. (FAC ¶ 24.)

PAGE 3 – OPINION AND ORDER

Dr. Coughlin, a pediatrician, visited Plaintiffs after Crone completed her interviews. (FAC ¶ 25.) Dr. Coughlin asked Plaintiffs why they at first declined an ultrasound, criticized Plaintiffs for not vaccinating the baby, and informed Plaintiffs that he would call social services if Sawyer continued to refuse a blood draw.[3] (FAC ¶¶ 25-27.) Sawyer told Dr. Coughlin that she was tired and hungry and asked to "talk about doing the blood test the following day." (FAC ¶ 28.)

Twenty minutes later, Caballero and five security officers entered Plaintiffs' room. (FAC ¶¶ 29-30.) Caballero took Plaintiffs' baby to a different room and instructed the hospital staff to proceed with "regular treatment." (FAC ¶ 30.) The hospital staff responded by administering to I.S. a vitamin K shot, eye ointment, a Hepatitis B vaccine, and immunoglobulin. (FAC ¶ 30.) The hospital staff then placed I.S. in a separate room and would only allow Sawyer to see her "under supervision . . . for no more than 30 minutes at a time." (FAC ¶ 31.)

The next day, Sawyer, who the hospital had not cleared for discharge, appeared by telephone at a court hearing about the Legacy Defendants' report of medical neglect. (FAC ¶ 32.) Caballero reported to the court that Sawyer had refused to submit to a C-section. (FAC ¶ 33.) The court continued temporary protective custody of the baby, and placed the baby in a foster home upon discharge from the hospital. (FAC ¶¶ 34, 37, 41.) Prior to Sawyer's discharge, she submitted to a blood test, which was negative for HIV and Hepatitis B. (FAC ¶ 34.) Following

---

[3] Oregon law requires that "[a] licensed physician . . . attending [to] a pregnant woman in this state for conditions relating to her pregnancy during the period of gestation or at the time of delivery shall . . . take or cause to be taken a sample of blood of every woman so attended at the time of the first professional visit or within 10 days thereafter." OR. REV. STAT. § 433.017(1). A physician, however, cannot take a blood sample without asking for and receiving the patient's consent. See OR. REV. STAT. § 433.017(3) ("In all cases . . . the physician . . . shall request consent of the patient to take a blood sample. A sample may not be taken without the patient's consent.").

an adjudicatory hearing, the court dismissed the petition against Plaintiffs and returned "full custody of the baby" to them. (FAC ¶¶ 35-36.)

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (citation and quotation marks omitted).

## DISCUSSION

Plaintiffs bring two § 1983 claims against the Legacy Defendants, alleging that they violated Plaintiffs' constitutional rights by taking temporary custody of I.S. and denying Plaintiffs' right to make medical decisions for I.S. The Legacy Defendants move to dismiss Plaintiffs' claims, arguing that Plaintiffs have failed adequately to plead that the Legacy Defendants acted under color of state law. *See generally Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011) (stating that to establish liability under § 1983, a plaintiff must show that the alleged constitutional deprivation was "committed by a person acting under color of state law," and explaining that "[t]he 'under color of law' requirement under § 1983 is the same as the Fourteenth Amendment's 'state action' requirement"). Plaintiffs argue that they have alleged sufficient facts to support a finding of state action under the joint action test. (Pls.' Resp. at 6-7.)

As explained below, even accepting all factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs' allegations do not support a plausible inference that the Legacy Defendants acted under color of state law here. The Court therefore grants the Legacy Defendants' motion to dismiss.

I.  **APPLICABLE LAW**

"The Supreme Court has articulated four tests for determining whether a private [party's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test." *Franklin v. Fox*, 312 F.3d 423, 444-45 (9th Cir. 2002) (citation omitted). "The joint action test asks 'whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1129, 1140 (9th Cir. 2012) (citation omitted). The test "can be satisfied either 'by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents.'"[4] *Id.* (citation omitted). The joint action test, however, "requires that the private parties have participated in the 'activity which deprive[d] [the plaintiffs] of constitutional rights.'" *Smith v. N. Star Charter Sch., Inc.*, 593 F. App'x 743, 744 (9th Cir. 2015) (citation omitted); *see also Tsao*, 698 F.3d at 1140 ("[J]oint action exists when the state has 'so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity.'") (citation omitted).

---

[4] Plaintiffs do not allege that the Legacy Defendants conspired with a state actor. (*See* Pls.' Resp. at 6-7, arguing that Plaintiffs' allegations show that the Legacy Defendants "jointly and willfully participated with Defendant Caballero in violating [Plaintiffs'] constitutional rights").

## II. ANALYSIS

Plaintiffs allege that Caballero took custody of Plaintiffs' baby at Legacy Emanuel in response to the Legacy Defendants' report of possible medical neglect. (FAC ¶¶ 29, 37, 41.) Plaintiffs allege that Caballero then instructed the hospital staff to proceed with "regular treatment," and the staff responded by administering a vitamin K shot, eye ointment, a Hepatitis B vaccine, and immunoglobulin before placing Plaintiffs' baby in a separate room where the staff allowed Sawyer to see her baby only "under supervision while she was feeding her." (FAC ¶¶ 30-31.) Plaintiffs also allege that immunoglobulin is "not 'regular treatment' for newborn babies nor was it medically justified." (FAC ¶ 30.)

The Court dismissed Plaintiffs' original complaint on the ground that Plaintiffs failed to plead sufficient facts to support a plausible inference that the Legacy Defendants engaged in state action here. *See Sawyer v. Legacy Emanuel Hosp. & Health Ctr.*, No. 3:18-cv-02128-SB, 2019 WL 1982530, at *5 (D. Or. May 3, 2019) (dismissing original complaint and recognizing that several federal district courts have held that merely reporting suspected child abuse does not constitute state action). The Court reasoned that the Legacy Defendants are mandatory reporters of child medical neglect, they reported suspected medical neglect to DHS, DHS took custody of the baby, and thereafter the Legacy Defendants provided medical care at the direction of DHS. *Id.*; *see also* OR. REV. STAT. § 419B.010 ("Any public or private official having reasonable cause to believe that any child with whom the official comes in contact has suffered abuse [including failure to provide adequate 'medical care that is likely to endanger the health or welfare of the child'] . . . shall immediately report or cause a report to be made" and failure to do so is a "Class A violation").

In response to the Court's opinion, Plaintiffs filed an amended complaint, adding these new allegations to their original allegations:

PAGE 7 – OPINION AND ORDER

- "On information and belief, it is hospital policy that no breech baby will be born vaginally and will only be delivered by surgical C-section" (FAC ¶ 11);

- "As the parent, [Sawyer] has statutory rights under Oregon law to decline all of the above listed treatments on either religious or philosophical grounds" (FAC ¶ 11);

- "The hospital staff advised [Sawyer] that a midwife was not available" (FAC ¶ 13);

- "Sawyer was at all relevant times, a capable adult . . . and capable of making her own health care decisions" (FAC ¶ 14);

- "The hospital staff never advised [Sawyer] that the only service offered by the hospital in the event of a breech, would be a surgical C-section" (FAC ¶ 18);

- "Both the attending doctor and attending hospital staff expressed anger at [Sawyer] and [Arnold] because the circumstances forced them to deliver the baby vaginally, instead of via surgical C-section" (FAC ¶ 21);

- "Other than declining eye ointment, vitamin K, and any vaccines for baby I.S., neither [Sawyer] nor [Arnold] refused any other medical treatment for baby I.S. or [Sawyer]" (FAC ¶ 22);

- "On information and belief, Defendant Crone also interviewed the hospital staff and doctor that attended the birth of baby I.S." (FAC ¶ 24);

- "At the time of the birth of baby I.S., both [Sawyer] and [Arnold] were in their early thirties and they both had their hair in long 'dreadlocks.' On information and belief, Dr. Coughlin assumed from the plaintiffs['] unkempt appearance that they were drug users" (FAC ¶ 25);

- "Sawyer [asked if they could talk about doing the blood test the following day but] never refused to submit to the [blood] test" (FAC ¶ 28);

- "When defendant Caballero took custody of baby I.S., the hospital was not yet ready to discharge either baby I.S. or her mother, [Sawyer]" (FAC ¶ 29);

- "[I]mmunoglobulin, a treatment for those infected with hepatitis B[,] . . . is not 'regular treatment' for newborn babies nor was it medically justified" (FAC ¶ 30);

- "At the court hearing on the 21st, Defendant Caballero wrongfully represented to the court that Rachel Sawyer had refused to submit to a C-section" (FAC ¶ 33);

- "Prior to being discharged, [Sawyer] submitted to the blood test which had been requested by Dr. Coughlin. Test results confirmed that [Sawyer] was negative to both HIV and Hepatitis B" (FAC ¶ 34); and

- "Dr. Coughlin lacked reasonable grounds to believe that [Sawyer] or [Arnold] medically neglected baby I.S. and he acted in bad faith, as the only reason he requested the social worker contact Oregon DHS to take emergency custody was because of [Sawyer]'s request for additional time to submit herself to a blood test, a test required by statute that can be performed as late as 10 days after giving birth." (FAC ¶ 37.)

These new allegations do not change the Court's prior conclusion that the Legacy Defendants did not engage in state action here. On the contrary, Plaintiffs' allegations support the Court's prior conclusion that the Legacy Defendants were acting as private providers of medical care with a mandatory statutory duty to report suspected medical neglect. Several federal district courts have held that merely "reporting suspected child abuse . . . does not constitute state action" for purposes of § 1983. *See Gay v. Children's Hosp. of Pa.*, 18-02880, 2018 WL 3447173, at *5 (E.D. Pa. July 16, 2018) (collecting cases and dismissing § 1983 claims on the ground that the private defendants, including a hospital and its physician, did "not become state actors solely because, as mandated reporters under state law, they reported or failed to report suspected child abuse"); *see also Doe v. Tsai*, No. 09-01198, 2010 WL 2605970, at *12 (D. Minn. June 22, 2010) ("[The doctors here] are mandatory child-abuse reporters under Minnesota law. . . . Although they were providing information to law enforcement, the doctors do not become state actors simply by operating under a state statute."); *cf. N.L. v. Children's Hosp. Los Angeles*, 711 F. App'x 433, 434 (9th Cir.), *cert. denied*, 139 S. Ct. 315 (2018) ("The pleading plausibly alleges that, in performing an intrusive forensic examination of N.L., [the defendant hospital] was not providing medical treatment but instead was exercising its discretion to collaborate with county government in the laudable endeavor of investigating child abuse, a potential crime."); *Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 616 (6th Cir. 2018)

("Had the County conscripted [the private hospital] as an investigative arm of the State, the [private hospital's] physicians' actions would be state action[.]").

Plaintiffs attempt to plead state action by alleging that the Legacy Defendants made the report to DHS in bad faith, and then provided care that was not medically necessary. Plaintiffs have not alleged any facts to support their conclusory assertions. On the contrary, Plaintiffs allege facts that support a conclusion that the Legacy Defendants had reasonable cause to believe that Plaintiffs were preventing I.S. from receiving adequate medical care (e.g., Plaintiffs requested no medical technology during birth, Plaintiffs requested that the physicians "not touch" the baby even if in a breech position, Plaintiffs stated that Sawyer "does not want" a C-section even after the ultrasound confirmed the baby was in a breech position, and Sawyer refused to consent to a blood test after birth to determine if the baby was at risk of HIV or Hepatitis B transmission). In addition, once the Legacy Defendants made the mandatory report and DHS took custody of the baby, DHS instructed the Legacy Defendants to provide "regular treatment" and Plaintiffs have alleged no facts to support their assertion that the Legacy Defendants provided any treatment to I.S. beyond what the Legacy Defendants deemed to be medically necessary under the circumstances presented (including Sawyer's refusal to be tested for HIV or Hepatitis B).

For these reasons, the Court concludes that Plaintiffs have not alleged sufficient facts to support a plausible inference that the Legacy Defendants engaged in state action here, and therefore grants the Legacy Defendants' motion to dismiss Plaintiffs' claims. *See Nielson v. Legacy Health Sys.*, 230 F. Supp. 2d 1206, 1208-09 (D. Or. 2001) (dismissing the plaintiff's § 1983 claims against private medical facilities and their employees, and explaining that "[t]he Ninth Circuit has consistently dismissed private hospitals, doctors, and attorneys in § 1983

claims for failing to come within the color of state law") (citations omitted); *see also* Gay, 2018 WL 3447173, at *5 (dismissing the plaintiff's § 1983 claims and explaining that "reporting suspected child abuse . . . does not constitute state action" and therefore the private hospital defendants did "not become state actors solely because, as mandated reporters under state law, they reported or failed to report suspected child abuse").

## CONCLUSION

For the reasons stated, the Court GRANTS the Legacy Defendants' motion to dismiss (ECF No. 24). In light of the fact that the Court has already provided Plaintiffs with an opportunity to amend their claims against the Legacy Defendants, the dismissal is without leave to amend.

**IT IS SO ORDERED.**

DATED this 18th day of October, 2019.

*/s/ Stacie F. Beckerman*

STACIE F. BECKERMAN
United States Magistrate Judge