IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


RACHEL SAWYER and DUSTIN ARNOLD,                    Case No. 3:18-cv-02128-SB

                Plaintiffs,                    **OPINION AND ORDER**

      v.

LEGACY EMANUEL HOSPITAL &
HEALTH CENTER; JAMES COUGHLIN,
M.D.; SUNSHINE CRONE; and CAROLINA
CABALLERO,

             Defendants.

---

**BECKERMAN, U.S. Magistrate Judge.**

      Plaintiffs Rachel Sawyer ("Sawyer") and Dustin Arnold ("Arnold") (together,

"Plaintiffs") filed this civil rights action under 42 U.S.C. § 1983. Plaintiffs allege that defendant

Carolina Caballero ("Caballero"), a case worker from the child welfare division of the Oregon

Department of Human Services ("DHS"), violated their constitutional rights by temporarily

removing their baby ("I.S.") from their custody and denying their right to make medical

decisions on her behalf.[1] Caballero moves for summary judgment on Plaintiffs' claims. The

---

[1] In an Opinion and Order dated October 18, 2019, the Court dismissed with prejudice
Plaintiffs' claims against defendants Legacy Emanuel Hospital & Health Center ("Legacy

Court has jurisdiction under 28 U.S.C. § 1331, and the parties have consented to the jurisdiction of a U.S. Magistrate Judge under 28 U.S.C. § 636(c)(1). For the reasons that follow, the Court grants Caballero's motion for summary judgment.

**BACKGROUND**[2]

On the evening of September 19, 2016, Sawyer went into labor on a flight from Florida to Portland, Oregon. (Sawyer Decl. in Supp. Pls.' Opp'n to Def.'s Mot. Summ. J. ("Sawyer Decl.") ¶¶ 7-8, ECF No. 44.) An ambulance transported Sawyer to Legacy Emanuel when she landed in Portland. (Sawyer Decl. ¶ 8.) During an initial examination, a physician named "Dr. Roesen" told Sawyer that "she wanted to do an ultrasound" because it "would help her to ensure that the baby was not in a breech . . . position," and Sawyer explained that she and Arnold, who was on his way to Portland, "had not chosen to have an ultrasound during the pregnancy." (Sawyer Decl. ¶¶ 9-11.)

After her initial examination and around the time that Arnold arrived at the hospital, the medical staff honored Sawyer's request to move into a birthing pool for "physiological pain relief." (Sawyer Decl. ¶ 12.) Sawyer's contractions later increased and she "started to push the baby out." (Sawyer Decl. ¶ 13.) Dr. Roesen and a nurse, however, told Sawyer that she "was not allowed to give birth in the pool," she "needed to move to the delivery room," and they "needed to do an ultrasound." (Sawyer Decl. ¶¶ 13-14.) Sawyer discussed the situation with Arnold and they eventually agreed to allow Dr. Roesen to perform an ultrasound on Sawyer. (Sawyer Decl. ¶ 14.)

---

Emanuel"), James Coughlin, M.D. ("Dr. Coughlin"), and Sunshine Crone ("Crone"). (Op. & Order, ECF No. 34.)

[2] Unless otherwise noted, the following facts are either undisputed or presented in the light most favorable to Plaintiffs.

The ultrasound revealed that Sawyer's baby was in a breech position, which caused Dr. Roesen to "shout[]" that Sawyer needed a Cesarean section ("C-section") delivery. (Sawyer Decl. ¶ 14.) As Dr. Roesen explained how she would perform a C-section, Sawyer's "baby came out of [her] vagina, to her chest." (Sawyer Decl. ¶ 15.) Dr. Roesen helped deliver the remainder of the baby's body from the birth canal, but the process caused the baby's arm to break. (Sawyer Decl. ¶ 16.)

Following the delivery, the nurses told Plaintiffs that "they would bring in an x-ray machine." (Sawyer Decl. ¶ 17.) The nurses also asked Sawyer if they could perform "a range of interventions on the baby, including taking her blood numerous times." (Sawyer Decl. ¶ 18.) Sawyer agreed to allow the nurses to check the baby's blood, but she told the nurses that she and Arnold "did not want eye ointment or Vitamin K administered to the baby" and "hadn't yet decided if [they] want to give [their] baby vaccines." (*Id.*) Sawyer also asked to wait to have her blood taken and for time to think about other injections and vaccines. (Sawyer Decl. ¶ 21.)

That afternoon, Crone, a social worker at Legacy Emanuel, interviewed Plaintiffs in their hospital room. (Sawyer Decl. ¶ 22.) Crone completed a report based on her interview. (Sawyer Decl. Ex. 1, at 1-2.) Crone's report noted, among other things:

1. Sawyer's urine drug screen was positive for THC;

2. The medical staff was "[a]waiting confirmation [and the] baby's labs";

3. Plaintiffs were "unmarried but [a] long-time partnered couple";

4. Plaintiffs were "not forthcoming with identifying information";

5. Plaintiffs were "not wanting ultrasounds, vaccinations, etc.";

6. There was a "[f]ear" that Arnold "may leave [the hospital with the] baby";

PAGE 3 – OPINION AND ORDER

7.    Sawyer reported that she and Arnold were "nomadic travelers" headed to Williams, Oregon, to live and work on a "farm/commune for the winter months, possibly longer";

8.    Sawyer "describe[d] initially being disappointed with a hospital birth as she wanted a natural home-birth";

9.    Sawyer reported that she was "now at ease and . . . fe[lt] more comfortable in [an] environment of professionals"; and

10.   Arnold was not willing to sign the baby's birth certificate paperwork before it was "looked over by his attorney."

(Sawyer Decl. Ex. 1, at 1-2.) Crone's report concluded by stating that Crone had advised Plaintiffs on the "'next steps' including requirements such as obtaining [a] car seat," and that Crone's "impression" was that the baby was "safe" to discharge with Plaintiffs. (Sawyer Decl. Ex. 1, at 2.)

After Crone left Plaintiffs' room, Dr. Coughlin, a pediatrician, arrived and asked why Plaintiffs had refused an ultrasound. (Sawyer Decl. ¶ 23.) Dr. Coughlin wrapped a bandage around the baby's broken arm, told Plaintiffs that he needed to run blood tests on Sawyer "and/or the baby" to ensure that Sawyer did not "have AIDS" or other diseases that could have been passed on to the baby, and told Sawyer he "would have to call DHS" if Sawyer would not "agree to what he wanted to do." (Sawyer Decl. ¶¶ 23-24.) Dr. Coughlin left and later returned to Plaintiffs' room. (Sawyer Decl. ¶ 25.) When he returned, Dr. Coughlin told Plaintiffs that he was "trying to compromise" and going to give Sawyer "another chance" to "agree with his demands to take [her] blood." (Id.) Dr. Coughlin left after Arnold stated that Dr. Coughlin was threatening Plaintiffs. (Id.)

After Dr. Coughlin left Plaintiffs' room, DHS assigned Caballero, a case worker, to respond to Legacy Emanuel because DHS had received "a report of medical neglect placing a newborn child at immediate threat of harm." (*See* Caballero Decl. in Supp. Def.'s Mot. Summ. J. ("Caballero Decl.") ¶¶ 2, 4, ECF No. 39.) When she arrived at Legacy Emanuel, and before she visited Plaintiffs' room, Caballero spoke with hospital staff, including the treating physician, nurses, and a hospital social worker. (Caballero Decl. ¶¶ 5-6.) During these conversations, the hospital staff provided Caballero with the following information, which she "believed to be true":

1.    Sawyer "had been on a flight to Portland from Florida";

2.    Sawyer went into labor during the flight "and, upon arrival in Portland, was transported to Legacy Emanuel Hospital, where she was met by . . . Arnold, the apparent father of the child";

3.    The hospital staff determined that "Sawyer's in utero child was in the breech position";

4.    Sawyer "had refused a Cesarean section and insisted on a natural birthing process for the child 'no matter what'";

5.    The baby's arm broke during "the natural birthing process," and the lead nurse reported that the "broken humerus was observable and rubbing against [the baby's] skin";

6.    The baby "had tested positive for THC, the active ingredient in marijuana";

7.    The baby "was born four weeks premature and needed medical monitoring";

8.    Plaintiffs "refused to allow any medical treatment for [the baby], including the broken arm";

PAGE 5 – OPINION AND ORDER

9.     Dr. Coughlin believed that the "failure to provide immediate medical treatment to [the baby] was 'life threatening'";

10.     After being "confronted with the threat to the [baby's] life from the lack of medical treatment," Arnold "responded to the effect of 'if that is what God wants . . .' and continued to refuse any medical treatment" for the baby; and

11.     The medical staff was concerned that Plaintiffs "would leave the hospital with the child 'at any moment,' which was believed to place the [baby's] safety in jeopardy."

(Caballero Decl. ¶ 5.)

    Caballero, a nurse, and three police officers visited Plaintiffs' room after Caballero spoke to the hospital staff. (Sawyer Decl. ¶ 26; Caballero Decl. ¶¶ 5-6.) When they arrived, Caballero told Sawyer that she was "with DHS and wanted to talk with [Sawyer] alone." (Sawyer Decl. ¶ 26.) Sawyer told Caballero that she "would talk with her alone only if the cops also left, but [Caballero] refused[.]" (Id.) After meeting and speaking with Plaintiffs, and after engaging in "further discussion with hospital staff," Caballero "learned and/or observed" the following:

1.     Plaintiffs "described themselves as 'nomadic travelers,' who reportedly intended to take [the baby] to a cannabis commune in Williams, Oregon, for which they could not provide an address";

2.     Arnold "refused to provide his true name, identifying himself only by the name 'Warrior'";

3.     Arnold had "been hostile with medical staff at the hospital, including hospital security, as well as the Portland Police and [Caballero]";

4.     Arnold was "ultimately trespassed from the hospital by hospital security";

5.    After Arnold "was trespassed from the hospital," Sawyer "refused to make a plan with [Caballero] for appropriate medical care for [the baby], including treatment of the broken arm";

6.    Portland Police failed to "convince" Sawyer to "allow the hospital to give treatment to [the baby]"; and

7.    Arnold "had a history of domestic violence and arrests for assaultive behavior."

(Caballero Decl. ¶¶ 6-7.)[3]

After Caballero spoke to Plaintiffs and Arnold left the room, the nurse told Sawyer that the medical staff "needed to monitor the baby because of her broken arm." (Sawyer Decl. ¶¶ 26-27.) After being told that the medical staff could not bring the monitoring equipment to her room, Sawyer "agreed and [they] eventually walked to the intensive care unit where . . . the monitoring equipment was located." (Sawyer Decl. ¶ 27.) When they got to the intensive care unit, Caballero and the medical staff took the baby into temporary protective custody and told Sawyer she would "only be allowed to see her for 30-minute 'feedings.'" (Sawyer Decl. ¶ 28; Caballero Decl. ¶ 9.) DHS took the baby into temporary protective custody based on the information that the hospital staff had provided to Caballero and the events that Caballero observed. (Caballero Decl. ¶ 8.) DHS made the decision after Caballero spoke with her

---

[3] Sawyer maintains that she "never refused medical treatment for [the baby]," nobody ever told her that the baby was "premature or needed the higher level of care that premature newborns require," her "concern and priority" was the baby's arm, she "eagerly cooperated with the treatment of [the] baby's broken arm," none of the doctors or nurses told Plaintiffs that "the interventions that [they] questioned or refused were medically necessary or immediately urgent for [the baby's] health or well-being," and Caballero never told Sawyer that "any other treatment was medically necessary or immediately urgent." (*See* Sawyer Decl. ¶¶ 18-21, 27.) Nothing in the record, however, conflicts with Caballero's account about what Dr. Coughlin and the hospital staff told Caballero about the baby's condition and the perceived threats to the baby's safety.

supervisor and the responding police officers, and in light of "the combined risk of flight and danger to [the baby]." (Caballero Decl. ¶ 8.)

After taking the baby into temporary protective custody, Caballero "authorized hospital staff to administer routine medical care to [the baby], without further specifics." (Caballero Decl. ¶ 9.) Sawyer and the baby were discharged from the hospital two days later.[4] (Sawyer Decl. ¶ 28.)

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

///

///

---

[4] The parties participated in juvenile court proceedings after Legacy Emanuel discharged Sawyer and I.S. During conferral, Plaintiffs "conceded that the alleged civil rights violations on which their claims are premised only occurred prior to the juvenile court proceedings." (Def.'s Mot. Summ. J. at 3 n.2.) Accordingly, the Court addresses only the events that occurred at the hospital.

## II.    DISCUSSION

Plaintiffs bring two claims against Caballero, both styled as claims for violations of Plaintiffs' Fourteenth Amendment rights. (*See* First Am. Compl. ¶¶ 44, 49, alleging that Caballero's actions resulted in the "violation of Plaintiffs' Fourteenth Amendment right to procedural due process," and the denial of Plaintiffs' "liberty interest protected by the Fourteenth Amendment"). Caballero moves for summary judgment on both claims. (Def.'s Mot. Summ. J. at 2.) For the reasons explained below, the Court grants Caballero's motion.[5]

### A.    Summary of Sawyer's Claims and Caballero's Arguments

In her first claim, Sawyer alleges that Caballero violated her "Fourteenth Amendment right to procedural due process in that there was no medical neglect or emergency circumstance to justify deprivation of custody without parental consent or a prior court order." (First Am. Compl. ¶ 44.) In her second claim, Sawyer alleges that Caballero denied Sawyer her liberty interest in the care of her child in violation of OR. REV. STAT. § 419B.090(4). (First Am. Compl. ¶ 49.)

Caballero argues that she is entitled to summary judgment on Sawyer's claims because "the taking of I.S. into protective custody was supported by exigent circumstances due to the risk of imminent harm to the child if I.S. did not receive adequate medical treatment, including the possibility that Plaintiffs would take I.S. from the hospital without a plan for medical treatment of existing injuries." (Def.'s Mot. Summ. J. at 3.) Caballero also argues that Sawyer's second claim is "premised on a violation of a state statute, upon which a Section 1983 civil rights claim cannot rest[.]" (Def.'s Mot. Summ. J. at 4.) Additionally, Caballero argues that she is entitled to

---

[5] Arnold acknowledges that Caballero is entitled to summary judgment on his claims "based solely on [his] lack of standing as a parent." (Pls.' Opp'n at 1.) Accordingly, the Court grants Caballero's motion for summary judgment on Arnold's claims, and dismisses those claims with prejudice for lack of standing.

summary judgment on qualified immunity grounds, because "there was no clearly established legal precedent showing that either taking I.S. into protective custody under the appurtenant facts was not constitutionally-sufficient exigency or that authorizing hospital medical staff to administer routine medical care to the newborn . . . would violate [Sawyer's] Fourteenth Amendment rights." (Def.'s Mot. Summ. J. at 4.)

### B.    Applicable Law

#### 1.    The Constitutional Rights at Issue

There is "no doubt" that Sawyer has "a liberty interest in the 'care, custody, and control of [her] child[].'" *Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir. 2012) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Courts have recognized that a parent's right to make decisions concerning the "care, custody, and control" of a child includes the right to direct the child's medical care. *See Mann v. Cty. of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) ("The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." (citing, *inter alia*, *Parham v. J.R.*, 442 U.S. 584, 602 (1979))).

Like all constitutional rights, however, a parent's right to make decisions concerning the care, custody, and control of a child is "not absolute." *Mueller*, 700 F.3d at 1186. "Under certain circumstances, these rights must bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child and of the State acting as *parens patriae*[.]" *Id.* For example, state officials can "remove children from their parents without their consent, and without a court order, [if] information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue." *Keates v. Koile*, 883 F.3d 1228, 1237-38 (9th Cir.

PAGE 10 – OPINION AND ORDER

2018); *see also Mueller*, 700 F.3d at 1187 (explaining that a parent's constitutionally protected right to the care and custody of her child must "step aside" if the child is in "imminent danger"); *Mann*, 907 F.3d at 1163 ("In an emergency medical situation, the County may proceed with medically necessary procedures without parental notice or consent to protect the child's health.").

### 2.    Qualified Immunity

Section 1983 provides a remedy for violations of rights secured by the Constitution by persons acting under the color of state law. 42 U.S.C. § 1983. However, the doctrine of qualified immunity shields "'government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sjurset v. Button*, 810 F.3d 609, 614 (9th Cir. 2015) (quoting *Mueller*, 700 F.3d at 1185)). This "doctrine 'gives government officials breathing room to make reasonable but mistaken judgments' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 614-15 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). In other words, the doctrine "'makes allowance for some constitutional mistakes,' . . . such as 'when an officer reasonably believes that his or her conduct complies with the law.'" *Id.* (quoting *Mueller*, 700 F.3d at 1185-86 and *Pearson v. Callahan*, 555 U.S. 223, 244 (2009)).

The Ninth Circuit "use[s] a two-step test to evaluate claims of qualified immunity[.]" *Demaree v. Pederson*, 887 F.3d 870, 878 (9th Cir. 2018). Under this two-step test, "'summary judgment is improper if, resolving all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the [state official's] conduct violated a constitutional right, and (2) that [constitutional] right was 'clearly established' at the time of the violation.'" *Id.* (quoting *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016) (en banc)).

Importantly, however, the Supreme Court has (1) "warned against beginning with the first [step] of the qualified-immunity analysis when it would unnecessarily wade into 'difficult questions' of constitutional interpretation that 'have no effect on the outcome of the case,'" and (2) "emphasized that lower courts have discretion to decide which of the two [steps] to 'address[] first in light of the circumstances in the particular case at hand.'" *Sjurset*, 810 F.3d at 615 (quoting *Pearson*, 555 U.S. at 244). The Ninth Circuit has found it "especially appropriate" to "heed the Supreme Court's admonition" against beginning with the first step of the qualified immunity analysis when "'a number of factual issues . . . remain unresolved' regarding the circumstances under which . . . DHS officials made their protective-custody decision." *Sjurset*, 810 F.3d at 615 (skipping the first step of the qualified immunity analysis and finding it "especially appropriate" to do so in light of unresolved factual issues).

### C.    Qualified Immunity

The Court finds it appropriate to exercise its discretion to skip the first step of the qualified immunity analysis here, because even if disputed factual issues remain as to whether Caballero violated Sawyer's constitutional rights, Caballero is entitled to qualified immunity because the law regarding the unconstitutionality of Caballero's conduct was not clearly established at the time of the events in question.

### 1.    Clearly Established Law

"In determining whether a government official's conduct violates clearly established law, the test is whether, 'at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Sjurset*, 810 F.3d at 615 (quoting *al-Kidd*, 563 U.S. at 741). The Supreme Court does "'not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). The Supreme

PAGE 12 – OPINION AND ORDER

Court has also "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742 (citing *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004)).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). That is, "[t]he rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), and *al-Kidd*, 563 U.S. at 741-42). Thus, "[i]t is not enough that the rule is suggested by then-existing precedent." *Id.* If the precedent is not "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply," the "rule is not one that 'every reasonable official' would know." *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664-66 (2012)). "A rule is too general if the unlawfulness of the [official's] conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

### a.    Protective Custody

According to Caballero, it was clearly established at the time of the challenged conduct in September 2016 that state officials could not take custody of a child "without prior judicial authorization unless the child was in imminent danger of serious bodily injury," but "the outstanding question of when a social worker could invoke the exigency exception and remove a child from its parents for medical neglect in a hospital had not been addressed in the Ninth Circuit until December 2016[.]" (Def.'s Mot. Summ. J. at 9, citing *Kirkpatrick*, 843 F.3d at 793).

In *Kirkpatrick*, a mother gave birth to a daughter five weeks before her due date. 843 F.3d at 786. The mother had a history of drug abuse and two of her other children had been placed in the care of the Washoe County Department of Social Services ("DDS"). *Id.* At the

hospital, the baby tested positive for methamphetamine and the mother informed the hospital that she had two children who already were in the custody of DDS, volunteered the name of the social worker managing her children's case, and admitted that she "used methamphetamine throughout her pregnancy, including as recently as two days prior." *Id.* As a result, the hospital contacted the case worker, who noted that a court had approved a plan to terminate the mother's parental rights for her other children, and advised placing a protective hold on the mother's newborn "to prevent her from being discharged." *Id.* at 787. The hospital honored the DDS hold request as a courtesy but allowed the newborn to interact with her mother and remain in her mother's hospital room. *Id.* Two days later, after social workers interviewed the mother and explained what was going on, the hospital discharged the baby into DDS's care, even though it had not obtained a warrant. *Id.*

The child's father sued the social workers and the county under 42 U.S.C. § 1983, alleging that the removal of his daughter violated his Fourth and Fourteenth Amendment rights. *Kirkpatrick*, 843 F.3d at 786. The district court held that the father failed to prove a constitutional violation and, therefore, granted the defendants' motion for summary judgment. *Id.* at 788.

On appeal, the Ninth Circuit en banc panel explained that in July 2008 (the time period at issue in that case), "it was well-settled that a child could not be removed without prior judicial authorization absent evidence that the child was in imminent danger of serious bodily injury." *Kirkpatrick*, 843 F.3d at 792 (citing *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1297 (9th Cir. 2007)). The panel, however, recognized that "[n]o Supreme Court precedent define[d] when a warrant is required to seize a child under exigent circumstances," and "none of the cases from this [circuit] explain when removing an infant from a parent's custody at a hospital to prevent

neglect, without a warrant, crosses the line of reasonableness and violates the Fourth

Amendment."[6] *Id.* at 793 (citing *Rogers*, 487 F.3d at 1291-93, *Mabe v. San Bernardino Cty.,*

*Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1108 (9th Cir. 2001), and *Wallis v. Spencer*, 202 F.3d

1126, 1138 (9th Cir. 2000)). The panel thus held that the social workers were entitled to qualified

immunity because "[n]o matter how carefully a reasonable social worker had read [the Ninth

Circuit's] case law, she could not have known that seizing [the baby at the hospital] would

violate federal constitutional law." *Id.* So too here.

Sawyer does not dispute that the events in question pre-dated *Kirkpatrick*. (*See* Pls.'

Opp'n at 10-11, 13-14.) However, Sawyer argues that unlike the Ninth Circuit's decision in

*Kirkpatrick*, "which requires an inquiry into existing case law, Oregon had prior to the time that

[Caballero] took baby I.S. into custody, clearly established as a matter of statutory law that

Fourteenth Amendment liberty interests and due process rights of parents are always implicated

in the construction and application of the provisions of ORS chapter 419B." (Pls.' Opp'n at 11,

14.) Sawyer relies on the following excerpt from the Oregon Supreme Court's decision in

*Department of Human Services v. JRF*, 273 P.3d 87, 91 (Or. 2012): "[T]he due process rights of

parents are always implicated in the construction and application of the provisions of ORS

chapter 419B." *Id.* (citing OR. REV. STAT. § 419B.090(4)).[7] Based on the Oregon Supreme

---

[6] "[T]he tests under the Fourth and Fourteenth Amendment for when an official may remove a child from parental custody without a warrant are equivalent." *Kirkpatrick*, 843 F.3d at 789.

[7] Section 419B.090(4) provides: "It is the policy of the State of Oregon to guard the liberty interest of parents protected by the Fourteenth Amendment to the United States Constitution and to protect the rights and interests of children . . . . The provisions of this chapter shall be construed and applied in compliance with federal constitutional limitations on state action established by the United States Supreme Court with respect to interference with the rights of parents to direct the upbringing of their children, including, but not limited to, the right to: (a) Guide the secular and religious education of their children; (b) Make health care decisions for their children; and (c) Discipline their children." OR. REV. STAT. § 419B.090(4).

Court's statement about the application of OR. REV. STAT. § 419B.090(4), Sawyer argues that Caballero "knew or should have known" that she was violating Sawyer's constitutional rights. (Pls.' Opp'n at 11, 14.) The Court disagrees.

*JRF* was a dependency case, in which the Oregon Supreme Court addressed "the lawfulness of an order of the juvenile court that requires a father not to interfere with the ability of a child who is a ward of the court to visit other children who live with father but are not wards of the court." 273 P.3d at 91. Nothing in that case, or the language set forth in OR. REV. STAT. § 419B.090(4) itself, would have provided any meaningful guidance to Caballero that taking protective custody of I.S. in a hospital setting to prevent neglect would violate federal constitutional law. Rather, OR. REV. STAT. § 419B.090(4) merely reflects a state policy to "guard the liberty interest of parents protected by the Fourth Amendment to the United States Constitution and to protect the rights and interests of children[.]" OR. REV. STAT. § 419B.090(4).

Consistent with the Ninth Circuit's December 2016 holding in *Kirkpatrick*, it is clear that at the time of the events in question in September 2016, "[n]o Supreme Court precedent define[d] when [prior judicial authorization was] required to seize a child under exigent circumstances," and "none of the cases from this [Circuit] explain[ed] when removing an infant from a parent's custody at a hospital to prevent neglect, without [prior judicial authorization], crosse[d] the line of reasonableness and violate[d] the Fourt[eenth] Amendment." *Kirkpatrick*, 843 F.3d at 793 (citing *Rogers*, 487 F.3d at 1291-93 and *Mabe*, 237 F.3d at 1108).

As the Ninth Circuit has recognized that the law was not sufficiently clear at the time of the challenged conduct, Caballero is entitled to qualified immunity, and summary judgment, on Sawyer's first claim. *See Dunkle v. Dale*, 729 F. App'x 616, 617 (9th Cir. 2018) ("In our case, the defendants took custody of A.F. in 2012, four years before our decision in *Kirkpatrick*. We

are bound by our opinion in *Kirkpatrick* that social workers would not have known prior to our

decision that taking a newborn baby who tested positive for illegal drugs without a judicial

warrant violated the mother's constitutional rights. Accordingly, we affirm the district court's

grant of qualified immunity in favor of the defendants.").

**b.      Medical Care**

Sawyer's second claim challenges Caballero's direction to the hospital staff to provide

"routine care" to I.S. while in protective custody. (*See* Pls.' Opp'n at 12-13, arguing that

Caballero "instruct[ed]" the medical staff to administer eye ointment, vitamin K, and a vaccine,

even though Oregon statutes and administrative rules recognize a parent's right to refuse such

treatments).[8]

Similar to the Ninth Circuit's acknowledgment in *Kirkpatrick* that there was an absence

of case law on the constitutionality of removing an infant from a parent's custody at a hospital to

prevent neglect, the Ninth Circuit has also acknowledged that there are no cases outlining the

constitutional guidelines for resolving a parent's objections to an infant's time-sensitive medical

treatment. In *Mueller*, parents sued a detective who temporarily removed a sick infant from their

custody to secure a medical diagnostic test and treatment. On a second appeal, the Ninth Circuit

held that the detective was entitled to qualified immunity, in part because "no clearly established

law existed to guide [the d]etective[,]" where "[h]e was confronted with a physician insisting (1)

that the treatments be done, (2) that they be done quickly, (3) that they constituted the standard

of care, (4) that the risk of foregoing treatments outweighed the risks of treatment, (5) that the

treatments would completely eliminate any danger to [the infant], and (6) that if [the mother] left

---

[8] Although the summary judgment record is not clear as to what treatments I.S. received while in protective custody, during oral argument the parties did not dispute that the treatments provided to I.S. included, among other things, eye ointment, a Vitamin K shot, and a hepatitis B vaccination. The parties also agree that Caballero instructed the hospital staff to administer "routine care," and played no role in dictating any specific treatment or procedures.

with [the infant] untreated, [the infant's] condition could deteriorate so quickly that she could suffer serious injury or die before [the mother] could return to the hospital." *Mueller*, 700 F.3d at 1187-88.

In *Mueller*, the Ninth Circuit noted that the district court had not identified (in its 2007 opinion) "'any cases which have laid out the constitutional guidelines for resolving parental [non-religious] objections to medical treatment[,]'" and that "[f]ive years later, the Muellers still have not provided us with any cases specific enough to the emergency room facts and circumstances of this case to advance their cause." *Id.* at 1188. The Ninth Circuit, writing in 2012, noted that "[w]e have not uncovered a decision identifying a Fourteenth Amendment violation 'on facts even roughly comparable to those present in this case'" and "[n]owhere can we find any clearly established law which would have required a judicial hearing before [the detective] took the actions that [he] did when facing these dangers." *Id.* at 1188 (quoting *Ryburn v. Huff*, 565 U.S. 469, 474 (2012)).

Similarly here, Sawyer has not identified any cases specific enough to these facts and circumstances to suggest that Caballero was on notice in September 2016 that she was violating Sawyer's constitutional rights by asking the hospital to provide time-sensitive care for a newborn in protective custody.[9] *See Reynolds v. Bryson*, 716 F. App'x 668, 669 (9th Cir. 2018) (emphasizing that it is the plaintiff's "burden to prove" that the defendants violated clearly established law) (citing *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006)). Instead, Sawyer again relies on the Oregon Supreme Court's *JRF* opinion, but nothing in that

---

[9] Sawyer acknowledges that the treatments administered to I.S. must be provided on the day of birth. *See* Pls.' Opp'n at 13 (acknowledging that the Hepatitis B vaccine "is ordinarily given on the day of birth" and citing OR. REV. STAT. § 433.306, which provides that "[a] physician . . . is responsible for ensuring that the newborn infant receives vitamin K within 24 hours after birth by the most effective means").

dependency case would have provided any meaningful guidance to Caballero that authorizing routine care for a newborn in protective custody would violate federal constitutional law. As the contours of the constitutional right were not sufficiently clear that every reasonable official would have understood that she was violating a constitutional right, Caballero is entitled to qualified immunity, and summary judgment, on Sawyer's second claim.

## CONCLUSION

For the reasons stated, the Court GRANTS Caballero's motion for summary judgment (ECF No. 38).

**IT IS SO ORDERED.**

DATED this 21st day of July, 2020.

_____
STACIE F. BECKERMAN
United States Magistrate Judge